IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CLIFFORD R. HARDIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-03146-CV-W-HFS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

I. **Procedural Background**

On September 24, 2002, plaintiff applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 99-102). Plaintiff claimed a disability onset date of September 14, 2002, due to back problems. (Tr. 99). Plaintiff's application was initially denied, and he timely requested a hearing. A hearing was held on March 23, 2004, before an Administrative Law Judge "ALJ" (Tr. 44-74), and a supplemental hearing was held on September 3, 2004, before the same ALJ. (Tr. 75-84). By a decision dated October 29, 2004, the ALJ determined that plaintiff suffered severe impairments including disorders of the back; osteoarthrosis and allied disorders; and depression. (Tr. 16). However, the ALJ held that these impairments did not meet or equal a listing, and plaintiff retained the residual functional capacity "RFC" to perform his past relevant work as a telephone solicitor. (Tr. 20-21). For the reasons set forth herein, the decision of the ALJ is affirmed.

## II. Factual Background

Plaintiff's Testimony

At the time of the hearing, plaintiff was 36 years of age, 5' 11", and weighed 185 pounds. (Tr. 46). Although legally married, he was separated from his wife. (Id). Plaintiff has 4 children ranging in age from 10 to 17. (Id). Plaintiff's former wife has custody of the 2 younger children, and he raised the 2 older children. (Tr. 47). Plaintiff went to school through the 10th grade, and received a General Equivalency Diploma. (Id).

Plaintiff is able to read and write, but experiences pain and discomfort. (Tr. 48). He does not have a car, but possesses a drivers' license, and he receives financial assistance from the state. (Tr. 48-49). Plaintiff testified that he can not work due to pain; but he previously worked as a telemarketer; a carpenter; a car wash; in the shipping department of a factory; and as a press operator in a printing shop. (Tr. 49-50). Plaintiff last worked for Fairfield Resorts for 17 months in sales, but quit due to problems with pain. (Tr. 50). Prior to that he worked at Grand Vista Resorts as a telemarketer, but slipped and fell on ice. (Id). He took medication for awhile, however, one morning he could not get out of bed. (Tr. 50-51).

Plaintiff was treated by Dr. Zolkowski who prescribed Hydrocodone, and he also saw a pain medicine specialist, Dr. Chandra, who prescribed Valium. (Tr. 51). Plaintiff also takes Lexapro, and Trazodone as a sleep aid. (Tr. 51-52). Plaintiff testified that he had been diagnosed with a herniated disc in his cervical spine, but that someone on the medical staff at Columbia University refused to perform surgery to relieve his pain. (Tr. 53). Plaintiff stated that Dr. Zolkowski explained that

2

surgery could not be performed because of the location of the injury and the probability that "it'll all slip out of place." (Tr. 54).

When questioned by his attorney, plaintiff stated that he is in constant pain in his neck and upper back, and on a scale of 1 to 10, on average, his pain is a level 6 or 7. (Tr. 56). Plaintiff stated that he can turn his head from side to side, but it causes very bad pain. (Id). The pain in his neck travels to his upper back, through the midline area to his lower back. (Tr. 57). The pain also goes into his left shoulder down into his elbow. (Id). Plaintiff feels a burning sensation in his left elbow, into 3 fingers of his left hand. (Tr. 57-58). Plaintiff experiences pain in his left arm 5 days a week, on the level of a 6 or 7. (Tr. 58-59). Plaintiff also has pain in his lower back that radiates into both legs, on a level of 5. (Tr. 60). To alleviate the pain in his neck, plaintiff uses ice packs 2 to 3 times a week for about 10 to 15 minutes. (Tr. 60-61). When sitting, plaintiff needs to change position frequently, and he needs to lie down 3 to 4 times a day for 15 minutes to 1 hour. (Tr. 61-62).

Plaintiff explained that he speaks slowly due to lack of sleep and the effects of the medication. (Tr. 62-63). Sometimes he is awake for 20 to 30 hours before he can go to sleep. (Tr. 63). Plaintiff was also diagnosed with depression which results in crying spells. (Tr. 63-64). Some of the side effects from his medications include drowsiness and dizziness. (Tr. 64). Generally, twice a week, the pain in plaintiff's neck causes his head to ache. (Tr. 64-65).

Vocational Expert Testimony

Vocational expert, Terri Crawford, testified that plaintiff's past work as a car wash supervisor was light, skilled labor, performed at the light exertional level; his work as a press operator is considered medium, skilled labor, performed at the medium exertional level; his work

3

as a construction worker is considered very heavy work, performed at the heavy exertional level; and his work as a material handler is considered heavy, semi-skilled labor, performed at the heavy exertional level. (Tr. 65-67). Plaintiff's work as a poultry dresser is considered light, unskilled labor, performed at the light exertional level; and his work as a telephone solicitor is considered sedentary, semi-skilled labor, performed at the sedentary exertional level. (Tr. 67).

The ALJ asked the vocational expert to assume an individual with a 10th grade education and a G.E.D., who has the ability to read, write, and use numbers, with the same past work experience as plaintiff, and whose testimony was found to be credible. (Tr. 67). The vocational expert stated that such an individual could not perform plaintiff's past relevant work, or other work. (Id).

The ALJ then asked if he found that the individual could perform sedentary work with no overhead pushing or pulling, could he return to plaintiff's past relevant work. (Id). The vocational expert testified that the individual could perform plaintiff's past work as a telephone solicitor. (Id).

The ALJ next asked if he found that the individual could perform light work, with no overhead pushing or pulling, could he perform plaintiff's past relevant work. (Tr. 68). The vocational expert testified that the individual could perform sedentary work, as well as some light unskilled work, such as counter clerk, furniture rental clerk, photocopy machine operator, and cleaner or housekeeper. (Id).

The vocational expert was asked to consider the medical source statement authored by Dr. Miller, and whether such an individual could perform plaintiff's past work. (Tr. 69). The vocational expert testified that such an individual could not perform the past work, or any other work. (Id). When asked to consider the second medical source statement authored by Dr. Miller, the vocational expert's answer remained consistent. (Id).

4

Plaintiff's counsel asked the vocational expert to consider the second hypothetical person who was limited to sedentary jobs requiring no overhead pushing or pulling, and that the person would be at only 1/3 of the persistence and pace of the average worker; the vocational expert opined that such an individual could not perform plaintiff's past work as a telephone solicitor, or any other work. (Tr. 69-70). Further, if the individual needed to lie down 3 to 4 times a day for 15 minutes to an hour, again such a person could not perform plaintiff's past work or any other work. (Tr. 70). Also, if the person were additionally limited to occasional manipulation, reaching, handling, fingering and feeling as a result of the neck condition, the vocational expert opined that such an individual could not perform plaintiff's past work or any other work. (Id).

The ALJ then ordered a consultative examination by a psychologist with MMPI-2 testing and a medical source statement. (Tr. 70-71); and a consultative examination by a physiatrist with a medical source statement. (Tr. 71).

As previously noted, a second hearing was held on September 3, 2004:

Plaintiff's Testimony

Plaintiff testified that he experienced some improvement in pain since the last hearing due to steroid injections, but then the pain returned. (Tr. 76). Plaintiff's counsel stated he had no more questions for plaintiff. (Id).

Vocational Expert Testimony

After the ALJ reviewed his notes of the vocational expert testimony given by Ms. Crawford at the prior hearing, vocational expert, George Horne, testified that the jobs of car wash and printing

5

press operator occurred prior to the 15 period under consideration. (Tr. 79). However, Mr. Horne agreed with the balance of Ms. Crawford's opinion. (Id).

The ALJ asked Mr. Horne to consider an individual 37 years of age, with a 10th grade education, possessing a G.E.D., who has the ability to read, write and use numbers, and with the same past relevant work experience as plaintiff. (Tr. 79-80). Mr. Horne was also asked to consider the medical source statement of physiatrist, Dr. Corselini, and opine whether such an individual could perform any of plaintiff's past work. (Tr. 80). Mr. Horne opined that such an individual would be limited to the position of telephone solicitor as performed by plaintiff, and described in the DOT as a sedentary RFC. (Id). He then noted that this position indicates a light exertional RFC. (Id).

Mr. Horne explained that plaintiff's past work as a poultry dressing worker is described as heavy work, while the poultry eviscerator, cutting up the poultry, is considered light work. (Tr. 81). Mr Horne was then asked to consider the medical source statement of Dr. Akeson, and opined that such an individual would be able to perform all of plaintiff's past work. (Tr. 82).

When questioned by plaintiff's attorney, in consideration of Dr. Miller's statement of March 10, 2004, Dr. Horne testified that such a person could not perform plaintiff's past work. (Tr. 83). Mr. Horne also testified that if the person needed to lie down 3 to 4 times a day for a minimum of 15 minutes each time, all work would be precluded. (Id).

### III.  **Standard of Review**

On review, this court must determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000). Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support

6

the Commissioner's conclusion. Id. In considering whether existing evidence is substantial, evidence that detracts from the Commissioner's decision as well as evidence that supports it must be considered. Craig, at 436. The Commissioner's decision may not be reversed merely because substantial evidence exists in the record that would have supported a contrary outcome. Id.

**IV.     Analysis**

Plaintiff claims that the ALJ erred: (1) by failing to properly crediting his allegations of pain; (2) in determining his RFC[1]; and (3) in finding that he was capable of performing his past relevant work as a telephone solicitor. Generally, an ALJ's determination regarding a plaintiff's credibility is entitled to considerable weight. Hamilton v. Barnhart, 355 F.Supp.2d 991, 1002 (E.D.Mo. 2005); see also, Sanchez-Wentz v. Barnhart, 216 F.Supp.2d 967, 973 (D.Neb. 2002). Although subjective complaints of pain may be discredited if inconsistent with the evidence on the record as a whole, such complaints may not be disregarded solely because of a lack of objective medical evidence. Hamilton, at 1002. In making a credibility finding regarding subjective allegations of pain, the ALJ is required to consider observations by third parties and treating and examining physicians relating to the plaintiff's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication, and functional restrictions. Hamilton, at 1002; citing, Polaski v. Heckler, 739 F.2d 1320, (8th Cir. 1984). The plaintiff's "relevant work history" is an additional factor to be considered. Sanchez-Wentz, 216 F.Supp.2d at 974.

---

[1] Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Therefore, the ALJ's credibility and RFC determinations will be reviewed somewhat in tandem.

In this regard, the ALJ noted plaintiff's current medications consisting of Lexapro, Hydrocodone, Valium, and Trazodone, as well as the side effects including drowsiness and slow movement. (Tr. 18). Nevertheless, when compared to plaintiff's reported daily activities, the ALJ found plaintiff's allegations of pain to be less than credible. (Tr. 18). The ALJ noted that in the initial questionnaire required by the Social Security Administration to be completed, plaintiff stated that he was able to take care of his personal and grooming needs, prepare meals, shop for food, clothing and other items, do house cleaning and laundry, attend religious services and family gatherings, read, study astronomy, listen to music, watch television, drive, manage his finances, take short walk, and ride a bicycle. (Tr. 18). When examined by Dr. Akeson on May 3, 2004, plaintiff reported that he is independent for all self-care, he is able to read, write, use the telephone, handle mail and money. (Tr. 18, 290). Additionally, that he shares meal preparation, grocery shopping, cleaning, and laundry chores with his children. (Id). He also reported that he manages his medication regimen and pays the household bills. (Id). Based on the aforementioned, the ALJ found that plaintiff was able to engage in a fairly normal range of daily activities, inconsistent with an allegation of disability. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

The ALJ considered the medical records, and noted that while they evidenced a history of neck and back problems establishing some abnormalities of the cervical spine, the examining and treating physicians found few, if any, functional restrictions. Although plaintiff complained of depression, upon examination, Dr. Akeson reported that plaintiff's mental status examination was essentially normal. Further, plaintiff had not required regular psychiatric treatment.

The ALJ also found that plaintiff's historically low earnings suggested that he was not motivated to engage in productive activity, and it weighed against his credibility. It has been held

that a poor work history can be indicative of a lack of motivation to work rather than a lack of ability. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. Pearsall, at 1218. On the record at bar, the ALJ's credibility findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir. 2001).

Residual Functional Capacity

The RFC "is a function-by-function assessment of an individual's ability to do work-related activities." Brinegar v. Barnhart, 358 F.Supp.2d 847, 857 (E.D.Mo. 2005). The determination of residual functional capacity is a medical issue, which requires consideration of supporting evidence from a medical professional. Brinegar, at 857.

On October 19, 2001, plaintiff was seen by Dr. Jenny Chandra complaining of neck and back pain, difficulty with sleep, fatigue, and headaches. (Tr. 126-27). Dr. Chandry diagnosed left C7 radiculopathy and mechanical low back pain, and prescribed Prednisone and Valium, in addition to lumbar stabilization exercises. (Tr. 127). Dr. Chandry treated plaintiff again on November 16, 2001, and noted that he was doing much better with his arm pain and numbness, but continued to have pain in his lower back. (Tr. 125). Her diagnosis remained the same, she prescribed Vioxx and directed plaintiff to continue taking Hydrocodone, Valium, and Flexeril. (Tr. 125). On December 14, 2001, Dr. Chandry noted that plaintiff had several therapy sessions which made him feel better, and she advised plaintiff to continue taking the therapy classes as opposed to the narcotic medication. (Tr. 124).

9

Plaintiff was treated at Associates in Medicine from March 23, 2000, through March 18, 2002, for various ailments including neck pain, sinusitis and bronchitis. (Tr. 202-12). On July 10, 2001, plaintiff presented complaining of neck pain (Tr. 206), a few days later he was diagnosed with cervical myositis and cervical radiculopathy, prescribed Flexeril and Ultram, and advised to begin physical therapy. (Tr. 207). Results of an MRI of the cervical spine taken on August 2, 2001, indicated a herniated cervical disc which impinges on the left C-7 neuro \_\_\_\_ ? And at C-6 and C-7. (Tr. 204). Results of an MRI of the lumbar spine taken on the same day, indicated posterior herniated discs at mid-line at L-5 and S-1. (Id). Plaintiff was referred to a neurosurgeon for further evaluation and treatment. (Id). When plaintiff returned on October 8, 2001, complaining of neck pain, the record indicates that plaintiff continued to decline evaluation by a neurosurgeon. (Tr. 203). On March 18, 2002, the record indicates that plaintiff has a history of chronic neck pain, but reported that he was doing very well until he drove to Disney World, and irritated the pain in his neck by getting on the rides and swimming. (Tr. 202).

On March 22, 2002, plaintiff was treated by Dr. Kennith Miller for pain in his neck, shoulder and arm; Dr. Miller diagnosed cervical disc herniation at 5-6. (Tr. 265). Plaintiff was instructed to wear his cervical collar and given a prescription for Hydrocodone. (Tr. 265). During a visit the following month on April 19, 2002, Dr. Miller noted that plaintiff had a marked reduction in pain. (Tr. 263). He further noted that plaintiff requested to return to work, and he recommended that plaintiff return with caution. (Id). Yet, at the same time, Dr. Miller stated that plaintiff could return to work "without restrictions or limitations." (Id). On July 5, 2002, plaintiff presented with complaints of pain, and received a prescription for Vicodin. (Tr. 261). This treatment was essentially repeated on August 16, 2002 (Tr. 259). During a visit on September 10, 2002, plaintiff was

10

scheduled for an MRI on September 12th and continued on Vicodin. (Tr. 258). Notes from October 18, 2002, reveal plaintiff's claim that he never got the message for the MRI so a new appointment was made. (Tr. 256). An MRI of plaintiff's cervical spine taken on October 23, 2002, revealed no change from the MRI taken on August 2, 2001. (Tr. 268). On February 4, 2003, plaintiff presented requesting that Dr. Miller complete disability papers; Dr. Miller noted that plaintiff was unable to work at that time due to chronic pain and discomfort. (Tr. 254).

On February 4, 2003, Dr. Miller completed a Medical Source Statement-Physical in which he stated that plaintiff could lift and/or carry 5 pounds frequently and occasionally; stand continuously for 30 minutes and stand for 2 hours throughout an 8 hour workday with breaks; sit continuously for 1 hour and sit for 3 hours throughout an 8 hour workday with breaks; push and pull 50 to 60 pounds; occasionally climb, kneel, crouch, and reach, but never stoop or crawl. (Tr. 236-37). Plaintiff could frequently finger, feel, speak and hear. (Tr. 237). Dr. Miller also noted that plaintiff would need to lie down 1 to 2 times a day for 30 minutes, and that the pain medication slowed plaintiff's mental and physical performance. (Id).

By letter also dated February 4, 2003, Dr. Miller stated that plaintiff experienced chronic pain in his neck with radiculopathy into his arms and hands, and that the pain intensified by lifting, pushing, pulling, bending, stooping and movement of the arms and head. (Tr. 238). Therefore plaintiff needed to change the position of his body frequently, and the pain interfered with concentration and focusing. (Id).

Dr. Miller's notes of March 18, 2003, indicate that plaintiff was advised to continue his present medication. (Tr. 252). Notes reflective of plaintiff's visits throughout the balance of 2003, pretty much consistently reflect plaintiff's complaints of pain, and continued medication. However,

11

Dr. Miller noted full range of motion during plaintiff's visits on September 8, 2003 (Tr. 244), and on October 22, 2003 (Tr. 242), and on January 14, 2004, Dr. Miller noted that plaintiff got on and off the treadmill with ease and walked well. (Tr. 240).

On March 10, 2004, Dr. Miller completed another Medical Source Statement-Physical, and stated that plaintiff could lift and/or carry less than 5 pounds both frequently and occasionally; stand continuously for 30 minutes and stand for 1 hour during an 8 hour workday with breaks; sit continuously for 1 hour and sit for 4 hours in an 8 hour workday with breaks; push or pull a maximum of 50 pounds; never crawl and only occasionally finger and feel; and lie down 3 times a day for 1 hour. (Tr. 275-76). Dr. Miller noted that the pain medication made plaintiff dizzy and sleepy. (Tr. 276).

On April 13, 2004, plaintiff was examined by disability consultant, Dr. Thomas Corsolini. (Tr. 296-97). Dr. Corsolini noted that plaintiff had previously applied for disability benefits 2 or 3 times, and that his primary complaints were neck and back pain, and depression. (Tr. 296). Dr. Corsolini reviewed MRI studies of plaintiff's cervical spine taken in August of 2001, and October of 2002, which showed some extrusion and indentation, but he noted that the spinal cord itself showed a normal signal. (Id). Dr. Corsolini's impression was that probable psychogenic depression outweighed plaintiff's pain complaints. (Tr. 297). He recommended a psychological evaluation. (Id).

Dr. Corsolini completed a Medical Source Statement-Physical noting that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; no limitation on standing, walking, sitting, or pushing and pulling. (Tr. 300-01). Dr.Corsolini also noted that plaintiff should only occasionally climb, balance, kneel, crawl, crouch, or stoop. (Tr. 301). He noted that there were no

12

restrictions with reaching overhead, handling, fingering, or feeling, and there were no environmental limitations. (Tr. 302-03).

On April 22, 2004, plaintiff was seen by disability consultant, Dr. Steven Akeson. (Tr. 288). Plaintiff reported his mood to be depressed half the time, and happy about half the time. (Tr. 290). Dr. Akeson noted that plaintiff's speech and thought processes were clear, and he appeared to have adequate insight and judgment skills. (Id). Dr. Akeson also noted that plaintiff was alert, his attention, concentration functioning, and quality of thinking was adequate. (Tr. 290-91). Plaintiff's mathematical and memory functioning was intact. (Id). Plaintiff's intellectual functioning appeared to be in the average range. (Tr. 291).

Dr. Akeson's diagnostic impression was that plaintiff had major depressive disorder, single episode, mild, and a GAF score of 55[2]. (Id). Dr. Akeson reported that plaintiff's ability to perform work-related functions seemed unimpaired due to psychological factors, and any disability that did exist was due to his physical problems. (Id). Dr. Akeson opined that plaintiff was able to understand and remember complex instructions; sustain concentration and persistence with complex tasks; interact socially and adapt to his environment; and appeared to have the judgment and basic math skills to manage his own funds. (Tr. 292).

Dr. Akeson completed a Medical Source Statement-Mental in which he repeated his impressions regarding plaintiff's understanding, memory, persistence, social interaction, and adaptation. (Tr. 293-95). He also noted that plaintiff had the capacity to perform on a regular and

---

[2] A GAF score of 55-60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Roberts v. Massanari, 150 F.Supp.2d 1004, 1012 (W.D.Mo. 2001); citing, Diagnostic and Statistical Manual of Mental Disorders, DSM-IV. 32 (4th ed. 1994).

13

sustained basis work-related mental activities which consisted of understanding simple instructions, function in unskilled work, and respond appropriately to supervision and co-workers. (Id).

In formulating plaintiff's RFC, the ALJ relied on the medical evidence noted above, and gave greater weight to the opinions of Drs. Corsolini and Akeson, as opposed to plaintiff's treating physician, Dr. Miller. (Tr. 18). While acknowledging that plaintiff had a lengthy history of complaints of neck and back pain, and testing revealed some abnormalities of the cervical spine, the ALJ noted that medical examinations resulted in few, if any, functional restrictions. Plaintiff argues that controlling weight should have been given to the opinion of Dr. Miller.

The opinions of a treating physician are entitled to controlling weight if they are supported by, and not inconsistent with the substantial medical evidence in the record. Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004). Opinions that are inconsistent with the record as a whole or if the opinions consist of vague, conclusory statements unsupported by medically acceptable data, they are given less weight. Stormo, at 805-06.

Here, the ALJ did not give Dr. Miller's opinion controlling weight because it was not supported by the other evidence of record, and inconsistent with his own treatment notes. The record supports the ALJ's determination. In his notes of April 19, 2002, Dr. Miller recommends return to work with caution, then further states that plaintiff was able to return to work without restrictions or limitations. (Tr. 263). Notably, throughout his treatment of plaintiff during 2001, and 2002, Dr. Miller never noted a need for plaintiff to recline several times a day; yet, when plaintiff presented disability papers on February 4, 2003, Dr. Miller began stating this recommendation. (Tr. 237, 254). Although Dr. Miller noted that plaintiff was able to push or pull 50 to 60 pounds, and could frequently finger and feel (Tr. 237), on the same date, he wrote a letter stating that plaintiff's pain

14

"is intensified by lifting, pushing, pulling, bending, stooping and movement of the arms and head." (Tr. 238). Similarly, months later Dr. Miller found that plaintiff had full range of motion. (Tr. 242, 244).

Based on these inconsistent findings by Dr. Miller, it cannot be said that the ALJ erred in failing to give his opinions controlling weight. It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. Pearsall, at 1219.

The medical evidence as a whole, aptly reflects plaintiff's pain as it relates to his neck and back. Thus, it is likely that plaintiff suffers some degree of pain, however, "the real issue is how severe that pain is." Sanchez-Wentz, 216 F.Supp.2d at 977. That being said, the ALJ found that although plaintiff suffered severe impairments including disorders of the back, osteoarthrosis, and allied disorders and depression, he retained the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; he was able to sit, stand, walk, push, and pull without limitations; he was able to perform occasional climbing, balancing, kneeling, crouching, crawling, and stooping; he had no manipulative, visual, communicative or environmental limitations; and no significant limitation of work-related mental functioning. (Tr. 20). The ALJ concluded that plaintiff had the capacity for a full range of work at the light exertional level, and based on plaintiff's allegations, as well as the medical records and observations of all of the physicians, there is substantial evidence to support the ALJ's RFC determination. Tellez, 403 F.3d at 957; Stormo, 377 F.3d at 807.

Past Relevant Work

15

Plaintiff contends that the ALJ erred in finding that he could return to his past relevant work as a telephone solicitor. An ALJ is required to make explicit findings with regard to the demands of past relevant work. Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999). Plaintiff admits that the ALJ made specific findings regarding his RFC, noting functional limitations, but argues that the ALJ made no specific findings regarding the physical and mental demands of his past work.

An explicit description of the relevant demands of past work can be derived from a "detailed description of the work obtained from the claimant, employer, or other informed source." Hamilton, 355 F.Supp.2d at 1007; quoting, Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). Here, the ALJ properly gave little weight to Dr. Miller's opinion that plaintiff was limited to work at the less than sedentary level. The ALJ made specific findings of plaintiff's RFC, and then solicited the opinion of the initial vocational expert as to the exertional level of plaintiff's past work as a telephone solicitor; this opinion was later confirmed by the second vocational expert. Masterson v. Barnhart, 363 F.3d 731, 740 (8th Cir. 2004) (the ALJ may rely on a vocational expert's testimony regarding the level of exertion of a claimant's past work); see also, Roberts v. Massanari, 150 F.Supp.2d 1004, 1011 (W.D.Mo. 2001). Thus, the ALJ's decision was supported by substantial evidence.

Accordingly, it is hereby

ORDERED that plaintiff's request for judgment is DENIED, and the decision of the Commissioner of Social Security is AFFIRMED. The clerk of the court is directed to enter judgment in favor of defendant.

/s/ Howard F. Sachs  
HOWARD F. SACHS  
UNITED STATES DISTRICT JUDGE

September 26, 2006

Kansas City, Missouri

17